FERGUSON, Circuit Judge,
dissenting:
In tersely affirming the District Court’s judgment, the majority ignores the plain language of the Endangered Species Act’s (“ESA”) implementing regulations, trivializes the vital process of inter-agency consultation, and ultimately drives closer to extinction the few existing Arizona pygmy-owls. The Army Corps of Engineers’ (the “Corps”) decision to forego consultation with the Fish and Wildlife Service (the “Service”) was both arbitrary and capricious given the Service’s persistent and persuasive objections to the two real estate developments. at issue. I must therefore dissent.
I.
The cactus ferruginous pygmy-owl (the “pygmy-owl”), a small bird, is about 6.75 inches tall and weighs between 2.2 and 2.6 ounces on average. Determination of Endangered Status for the Cactus Ferruginous Pygmy-Owl in Arizona, 62 Fed.Reg. 10730, 10730 (Mar. 10, 1997). “[It] is one of four subspecies of the ferruginous pygmy-owl” whose range extends “from lowland central Arizona south through western Mexico, to the States of Colima and Michoacan, and from southern Texas south through the Mexican States of Tamaulipas and Nuevo Leon.” Id. Pygmy-owls are considered non-migratory throughout their range and typically fly from tree to tree instead of on long single flights. Land Options L.L.C., DRAFT BIOLOGICAL ASSESSMENT: ENTRADA DEL ORO '20 (Aug. 9, 2001). They are capable of flying only short distances up to 100 feet or more over undisturbed vegetation. Letter from the U.S. Fish and Wildlife Service to the U.S. Environmental Protection Agency (Oct. 18, 2002).
The Arizona pygmy-owls are a distinctive lot. Unlike the pygmy-owls in Texas and Mexico, they have unique plumage and occupy- desertscrub and thornscrub habitats. Determination of Endangered Status for the Cactus Ferruginous Pygmy-Owl in Arizona, 62 Fed.Reg. at 10731. They are also subject to unique dangers. “Riverbottom forests and bosques, which supported the greatest abundance of [Arizona] pygmy-owls, have been extensively modified and'-destroyed by clearing, urbanization, water management, and hydrological changes.” Id. at 10740. In southern Arizona in particular, the actual loss and fragmentation of riparian habitat and the potential loss of additional habitat and movement corridors have contributed to a significant decline in the total Arizona pygmy-owl population from 36 in 2001 to just 18 in 2002. Id. at 10735, 10741; see also Proposed Designation of Critical Habitat for the Arizona Distinct Population Segment of the Cactus Ferruginous Pygmy-Owl, 67 Fed.Reg. 71032, 71032 (Nov. 27, 2002).
II.
The majority contends that we could affirm the judgment in this case based on Nat'l Ass’n of Home Builders v. Norton, 340 F.3d 835, 852 (9th Cir.2003), where we suggested delisting the Arizona pygmy-owl as a Discrete Population Segment (DPS). Maj. op. at 1070. The majority’s position is premature for two reasons. First, we did not vacate the Service’s DPS listing of the Arizona pygmy-owl in Nat’l Ass’n of Home Builders; instead, we remanded to the district court for further proceedings. *1072 Those proceedings are pending, and so the Arizona pygmy-owl has not been delisted as a DPS. Second, and more importantly, we carefully noted in Nat’l Ass’n of Home Builders that the “Home Builders do not challenge the [Service’s] determination that, once severed from the rest of the western pygmy-owl population, the Arizona pygmy-owls could he considered endangered.” 340 F.3d at 841 (emphasis added). Our decision in Nat’l Ass’n of Home Builders, therefore, has no bearing on the case before us because the Arizona pygmy-owl presently remains protected under the ESA.
III.
Section 7(a)(2).of the ESA directs all federal agencies, in consultation with the Service, to “utilize their authorities in furtherance of the purposes of this chapter by carrying out, programs for the conservation of endangered species and threatened species,” 16 U.S.C. § 1536(a)(1), and to “insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat] of such species.” 16 U.S.C. § 1536(a)(2). The ESA’s implementing regulations further require a federal agency to complete formal consultation with the Service if the agency determines that any action on its part “may affect” any listed species or critical habitat. The federal agency.may complete informal consultation with the Service if the agency determines that any action on its part may affect, but is “not likely to adversely affect,” any listed species or critical habitat, and the Director of the Service concurs in writing to the agency’s determination. 50 C.F.R. §§ 402.13, 402.14(a).
The majority reads this statutory and administrative scheme as affording federal agencies absolute discretion to determine whether any actions on their part “may affect” any listed species or critical habitat. See Maj. op. at 1070 (quoting 51 Fed.Reg. 19926, 19949 (June 3, 1986)) (“[The Service] lacks the authority to require the initiation of consultation.”). “Nothing in the regulations,” the majority concludes, “mandates the action, agency to enter into consultation after, it receives such a request.” Id.
But while an action agency is not required by law to consult the Service, the minimum threshold for an action agency to initiate consultation is low. The “may affect” standard “must be .set sufficiently low to allow Federal agencies to satisfy their duty - to ‘insure’ under section 7(a)(2)[that species' are not jeopardized].” 51 Fed.Reg. 19926, 19949 (June 3, 1986). A federal agency “must initiate formal consultation if its proposed action ‘may affect’ listed species or" critical habitat. Any possible effect,- whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement ...” Id. at 19949 (emphasis added).
The question, then, is not whether the law mandates the Corps to consult the Service, but whether the Corps arbitrarily and capriciously issued “no effect” determinations in the face of scientific evidence suggesting specific and serious effects of two real estate developments on the Arizona pygmy-owl. Put differently, the question is whether the Corps violated the plain meaning and intent of Section 7(a)(2) of the ESA by foregoing any consultation with the Service.
rv.
Under 5 U.S.C. § 706, we must set aside agency actions that are “arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.” United States v. Bean, 537 U.S. 71, 77, 123 S.Ct. *1073 584, 154 L.Ed.2d 488 (2002). To determine whether the Corps’ “no effect” determinations were “arbitrary and capricious,” we must decide whether the Corps “considered the relevant factors and articulated a rational connection between the facts [it] found and the choice [it] made.” Nat'l Ass’n of Home Builders, 340 F.3d at 841 (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). The Corps’ decision to forego consultation with the Service “must be reversed [if the Corps] ... entirely failed to consider an important aspect of the problem.” Id.
A.
In December 1999, the Corps granted a permit for a 598-acre property in Pima County, (southern) Arizona known as the Continental Reserve project. The development is adjacent to an area then-designated as an Arizona pygmy-owl critical habitat. The Corps determined that the development would have “no effect” on the Arizona pygmy-owl and issued the permit. The Service objected to the Corps’ decision contending specifically that “this particular project area serves as a movement corridor for the [Arizona] pygmy-owl and likely provides nesting, roosting, and foraging habitat.” The Corps nonetheless refused to initiate consultation.
Review of the administrative record reveals that the Corps’ decision to forego consultation with respect to the Continental Reserve project was both arbitrary and capricious. The Service has persistently objected to the Continental Reserve permit. It has pointed out that the development would (1) result in “the loss and fragmentation of upland and xeroriparian vegetation,” (2) lead to loss of “mesquite and palo verde trees and saguaro cacti which are components of [Arizona] pygmy-owl habitat,” and (3) “disrupt habitat connectivity ... hindering the ... movement corridor for the [Arizona] pygmy-owl.” The Service further underscored how the Continental Reserve area contains “those physical and biological features that are essential to the conservation of the species.” A “fragmented habitat [would] reduce 'the probability that local groups of [Arizona] pygmy-owls will recolonize naturally in order to offset population fluctuations and local population losses.” Proposed Designation of Critical Habitat for the Arizona Distinct Population Segment of the Cactus Ferruginous Pygmy-Owl, 67 Fed.Reg. at 71036.
Both the Biological Evaluation and the Environment Assessment that the Corps relied upon to render its “no effect” determination focused almost entirely on the fact that no Arizona pygmy-owl was physically located in the project area or in the immediate surrounding areas. But the actual physical presence of an Arizona pygmy-owl on or near the development is not the only way to establish a possible effect ■of the development on the species. The ESA implementing regulations make clear that “any possible effect,” even of “an undetermined character,” triggers consultation. 51 Fed.Reg. at 19949. The Corps ignored the Service’s scientifically compelling evidence demonstrating the effect of the Continental Reserve project on the potential habitat of Arizona pygmy-owls. The Corps had a duty to initiate consultation with the Service about this possible effect.
B.
In January 2001, the Corps granted a permit for a 404-acre property in Pinal County, (southern) Arizona known as the Entrada del Oro project. The development was located on an area then-designated as' an Arizona pygmy-owl critical habitat. The developer itself conceded that the property provided connectivity between the Arizona pygmy-owl breeding *1074 habitat along the Salt River and possible Arizona pygmy-owl breeding areas on the Gila river. The Corps thereafter issued a “may affect” determination and initiated informal consultation with the Service. But while the Corps’ request for informal consultation was pending, a district court vacated the critical habitat designation in the Entrada del Oro area. The Corps subsequently withdrew its request and issued a “no effect” determination.
Review of the administrative record again reveals that the Corps’ decision to change its assessment and forego consultation with respect to the Entrada del Oro project was both arbitrary and capricious. The Service pointed out that “because of the size of the proposed project!,] ... suitable [Arizona pygmy-owl] habitat present on site and adjacent areas, and the location of the project, [it][did] not believe adverse effects [were] not likely[,] ... insignificant!,] or discountable.” The developer’s own Biological Evaluation further noted that the Entrada del Oro project “does have potential nest cavities in saguaros and a few mesquite and.paloverde able to support pygmy-owls” and that “there is suitable habitat within the 440-acre property.”
The Corps has not shown .why the removal of the critical habitat designation in the Entrada del Oro area rationally eliminates the previously acknowledged effect of the development on loss of potential habitat for the Arizona pygmy-owl. The ESA implementing regulations make clear that formal consultation is triggered whenever an action “may affect listed species or critical habitat.” 50 C.F.R. § 402.14(a) (emphasis added). The Corps, and the majority, illogically imply that the presence of a critical habitat is necessary to trigger Section 7 consultation.
V.
At its core, this case is about exercising “institutionalized caution” in safeguarding endangered species. See Wash. Toxics Coalition v. EPA, 413 F.3d 1024, 1035, 2005 WL 1523669, No. 04-35138 (9th Cir. June 29, 2005) (“Placing the burden on the acting agency to prove that the action is non-jeopardizing [of the continued existence of an endangered or threatened species] is consistent with the purpose of the ESA and what we have termed its ‘institutionalized caution mandate[ ]’.”) (citation omitted); Tenn. Valley Auth. v. Hill, 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (“Congress has spoken in the plainest of words ... in favor of .affording endangered species the highest of priorities ... [by] adopting a policy which it described as ‘institutionalized caution’.”). The Corps ignored the possible effect of two developments on the additional loss and fragmentation of the Arizona pygmy-owl. It arbitrarily and capriciously refused to initiate Section 7 consultation with the Service even though the Service justifiably demanded it. See Sierra Club v. Marsh, 816 F.2d 1376, 1388 (9th Cir.1987) (deferring to the Service as “the agency with the more appropriate expertise”). It may be that further discussion and investigation could vindicate the Corps’ present position, but the Corps cannot be permitted to risk endangering the Arizona pygmy-owl by foregoing any consultation with the Service.