**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEFENDERS OF WILDLIFE;
CENTER FOR BIOLOGICAL DIVERSITY,
     *Plaintiffs-Appellants,*

v.

ROBERT B. FLOWERS, Lt. General,
Chief of Engineers and
Commander, US Army Corps of
Engineers; CHRISTINE TODD
WHITMAN, Administrator of US
Environmental Protection Agency;
GALE A. NORTON; STEVEN
WILLIAMS,
     *Defendants-Appellees,*

STEVEN A. OWENS, State of
Arizona, ex-rel, Director Arizona
Department of Environmental
Quality; GROSVERNOR HOLDINGS;
NATIONAL ASSOCIATION OF HOME
BUILDERS; SOUTHERN ARIZONA
HOME BUILDERS ASSOCIATION;
HOME BUILDERS ASSOCIATION OF
CENTRAL ARIZONA; SAGUARO RANCH
INVESTMENTS LLC; SAGUARO RANCH
DEVELOPMENT CORPORATION,
  *Defendants-Intervenors-Appellees.*

No. 03-16884

D.C. No.
CV-02-00195-CKJ

DEFENDERS OF WILDLIFE;
CENTER FOR BIOLOGICAL DIVERSITY,
        *Plaintiffs-Appellees,*

                v.

ROBERT B. FLOWERS, Lt. General,
Chief of Engineers and
Commander, US Army Corps of
Engineers; CHRISTINE TODD
WHITMAN, Administrator of US
Environmental Protection Agency;
GALE A. NORTON; STEVEN
WILLIAMS,

                *Defendants,*

STEVEN A. OWENS, State of
Arizona, ex-rel, Director Arizona
Department of Environmental
Quality; NATIONAL ASSOCIATION OF
HOME BUILDERS; SOUTHERN
ARIZONA HOME BUILDERS
ASSOCIATION; HOME BUILDERS
ASSOCIATION OF CENTRAL ARIZONA;
SAGUARO RANCH INVESTMENTS LLC;
SAGUARO RANCH DEVELOPMENT
CORPORATION,

        *Defendants-Intervenors,*

                and

GROSVERNOR HOLDINGS,
   *Defendant-Intervenor-Appellant.*

No. 03-16887

D.C. No.
CV-02-00195-CKJ

OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
April 11, 2005—San Francisco, California

Filed July 12, 2005

Before: Warren J. Ferguson, John T. Noonan, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Noonan;
Dissent by Judge Ferguson

**COUNSEL**

Michael Senatore, Washington, D.C., for plaintiffs-cross-appellants/appellees Defenders of Wildlife, et al.

Todd Aagaard, Assistant United States Attorney, Washington, D.C., for the defendants-appellees.

Norman D. James, Phoenix, Arizona, for defendant-intervenor-appellee/cross-appellant Grosvernor Holdings.

Richard Rollman, Tucson, Arizona, and Eric S. Merrifield, Seattle, Washington, for amicus National Association of Home Builders.

---

## OPINION

NOONAN, Circuit Judge:

Defenders of Wildlife and the Center for Biological Diversity (collectively Defenders) appeal the grant of summary judgment to the Army Corps of Engineers (the Corps). Defenders challenged the decision of the Corps not to consult with the Fish and Wildlife Service (the Service) on the effect on the Arizona cactus ferruginous pygmy-owl of two developments in Arizona. The district court found that the Corps' determination that the developments would have no effect on the pygmy owl was not arbitrary or capricious. We affirm its judgment.

### FACTS

The cactus ferruginous pygmy-owl, the bird at the center of our case, is described in *National Ass'n of Home Builders v. Norton*, 340 F.3d 835, 838 (9th Cir. 2003), where a description of its habitat is also set out. In that case, we also described how the Service came to designate the Arizona pygmy-owl as a discrete population segment (DPS), distinct from the pygmy-owls in Texas and in Mexico. We held that the Service had not demonstrated a rational basis in the listing rule for its finding that the Arizona pygmy-owl was a signifi-

cant part of the taxon to which it belongs and therefore the Service had acted arbitrarily and capriciously in designating the Arizona pygmy-owl as a DPS. *Id.* at 852.

*The Continental Reserve Permit.* In December 1999, the Corps received a permit application under the Clean Water Act, 33 U.S.C. § 1344 (a Section 404 permit application), for the Continental Reserve project, a 598-acre property being developed in the town of Marana, Arizona. Continental Reserve is a master-planned community with single-family residences, a 9-acre community park, a 10-acre elementary school site, and large areas of undisturbed open space.

The Service objected to the Corps' preliminary determination that the project would not affect federally listed species or their critical habitat and that formal consultation under Section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14, would not be required. The Service contended that "this particular project area serves as a movement corridor for the [pygmy-owl] and likely provides nesting, roosting, and foraging habitat."

On March 22, 2001, the Corps issued its Environmental Assessment, finding that the proposed activities would have no impact on the pygmy-owl or adjoining habitat. On that same date, it issued the Section 404 permit to Continental Reserve. After the permit had been issued, the Service continued to object, requesting formal consultation and notifying the Corps that it did not concur in its "no effect" determination.

*The Entrada de Oro Permit.* On November 22, 2000, Grosvernor Holdings (Grosvernor), a property owner, submitted a request to the Corps for an individual Section 404 permit under the Clean Water Act for the Entrada de Oro project. Entrada de Oro is a master planned community in Pinal County, Arizona, comprised of 440 acres which will contain single family residences, parks, a school site, and open spaces.

On November 15, 2001, the Corps issued its Environmental Assessment for the Entrada de Oro project. The Corps noted that it had withdrawn its initial request for consultation with the Service after the area had no longer been designated critical habitat, and that it had "fully considered" the Service's comments. On December 5, 2001, the Corps issued Grosvernor's permit. The permit had special conditions that mandated, inter alia, regular surveys for pygmy-owls in the future. After the Entrada de Oro permit had been issued, the Service requested formal consultation "to ensure that both the Corps and Grosvernor Holdings are in compliance with the Act."

## PROCEEDINGS

Defenders filed suit against the Corps under the ESA, 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Defenders challenged the Corps' "no effect" determinations and its decisions to forgo Section 7 consultations with the Service regarding the Continental Reserve and Entrada de Oro projects under the ESA.

Grosvernor filed a motion to intervene as of right under Fed. R. Civ. P. 24(a)(2). The court granted the motion as to the remedial phase of the litigation, but denied it as to the liability phase.

The parties filed cross-motions for summary judgment. On August 18, 2003, the court issued two orders granting the Corps' motions as to its permitting decisions for Continental Reserve and Entrada de Oro. The court noted that "the 'no effect' determination was a decision for the Corps to make, not the USFWS." The court found that

> based upon the best scientific and commercial evidence in the administrative record and the Corps' contemporaneous explanations for their 'no effect' determination, it is clear that the Corps considered

the relevant factors based upon the voluminous data before it, reasonably rejected the undocumented assertions made by the USFWS, and articulated a rational connection between the facts and its decision to make a 'no effect' determination.

On August 18, 2003, the court entered final judgment against Defenders. This timely appeal followed.

## ANALYSIS

**[1]** *Jurisdiction.* The Corps and amici challenge our jurisdiction arguing that the Defenders lack standing. They have, however, as the district court held, sufficiently established their members' interest in the Arizona pygmy-owl; that the Corps' decisions arguably may affect the bird and what may be its habitat; and that a contrary decision would have led to a remedy. Even now the case is not moot because a court could design a remedy to provide protection for the bird.

**[2]** *The Action Agency's Responsibility.* Regulations under the ESA provide:

> Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director [of the Fish and Wildlife Service] may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

50 C.F.R. § 402.14(a). The Service can request the action agency to enter into formal consultation. Nothing in the regu-

lations mandates the action agency to enter into consultation after it receives such a request. On the contrary, as the Service has explained:

> Although the Service will, when appropriate, request consultation on particular Federal actions, it lacks the authority to require the initiation of consultation. The determination of possible effects is the Federal agency's responsibility. The Federal agency has the ultimate duty to ensure that its actions are not likely to jeopardize listed species or adversely modify critical habitat. The Federal agency makes the final decision on whether consultation is required, and it likewise bears the risk of an erroneous decision.

51 Fed. Reg. 19926, 19949 (June 3, 1986). This court has come to the same conclusion. *See Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1447-48 (9th Cir. 1996).

[3] *The "No Effect" Rulings*. Our decision in *National Ass'n of Home Builders v. Norton*, 340 F.3d 835 was filed August 19, 2003, one day after the district court entered judgment in the instant case. Our decision puts in doubt the status of the Arizona pygmy-owl as a significant part of its taxon and would seem to require its delisting as a DPS.[1] We could

---

[1]On November 12, 2003, the National Association of Home Builders filed a request for entry of final judgment with the district court, urging "entry of judgment pursuant to the Ninth Circuit's decision that declares unlawful and vacates the Listing Rule." Order of the district court in *National Ass'n of Home Builders v. Norton*, CV 00-0903 (D. Ariz.), June 28, 2004. The district court took over six months to rule on this motion and then denied it in the above-referenced order, which has been supplied to us by Defenders. The district court acknowledged that the error detected by the Ninth Circuit in the listing rule was substantive, not procedural, and normally a substantially erroneous listing should be vacated. Citing to two decisions of other district courts, the district court held that it had the power to decline to set aside the listing. The court held that if it vacated

rely on *Ass'n of Home Builders* in affirming the judgment in this case. Out of an abundance of caution, we review the district court's decision de novo and hold that the decision rested on the firm foundation that no pygmy-owls had been found to live within either project area. True, the Service had once designated the Entrada de Oro area as critical habitat for the Arizona pygmy-owl; but this designation was vacated by the district court in *Ass'n of Home Builders* and thereafter the Service did not designate it as critical, noting "the lack of recent, verified locations and our inability to determine the presence of the primary constituent elements." 67 Fed. Reg. at 71040, Table 1. Similarly, the Service's nondesignation as critical of the Continental Reserve project area was properly read by the Corps as a finding that the land "was not essential to the functioning of Unit 3 as a corridor for movement of pygmy-owls."

*Grosvernor's Appeal*. Our disposition of the case makes it unnecessary to decide Grosvernor's appeal from the judgment limiting its intervention.

---

the rule "the twenty to forty birds comprising the Arizona pygmy-owl population would be entirely without protection under the ESA during the remand period." The court did not note the interest of the victorious plaintiffs in having the listing declared void. The court remanded to the Service without vacating the rule and without setting a time table for action by the Service. This result was all the more remarkable in that, as the court observed, the Service had indicated that "its attempts to continue its research regarding the pygmy-owl population in Arizona may be delayed by budgetary restraints, suggesting that the period without protection could be lengthy." As the court also noted, the Service had not objected to the vacating of its rule. Opposition to that came only from Defenders, an intervenor in the case. The upshot is that a listing rule that this court found to be arbitrary and capricious on August 19, 2003 is still alive in Arizona in April 2005 with no foreseeable termination in sight.

The history is also instructive on another point. In oral argument in this court it was speculated that our case was "a turf war" between the Service and the Corps. It may have been so at the start. But the Service appears to be hors de combat. The case is between the Corps and the nongovernmental intervenor.

For the reasons stated, the judgment of the district court is AFFIRMED.

---

FERGUSON, Circuit Judge, dissenting:

In tersely affirming the District Court's judgment, the majority ignores the plain language of the Endangered Species Act's ("ESA") implementing regulations, trivializes the vital process of inter-agency consultation, and ultimately drives closer to extinction the few existing Arizona pygmy-owls. The Army Corps of Engineers' (the "Corps") decision to forego consultation with the Fish and Wildlife Service (the "Service") was both arbitrary and capricious given the Service's persistent and persuasive objections to the two real estate developments at issue. I must therefore dissent.

I.

The cactus ferruginous pygmy-owl (the "pygmy-owl"), a small bird, is about 6.75 inches tall and weighs between 2.2 and 2.6 ounces on average. *Determination of Endangered Status for the Cactus Ferruginous Pygmy-Owl in Arizona*, 62 Fed. Reg. 10730, 10730 (Mar. 10, 1997). "[It] is one of four subspecies of the ferruginous pygmy-owl" whose range extends "from lowland central Arizona south through western Mexico, to the States of Colima and Michoacan, and from southern Texas south through the Mexican States of Tamaulipas and Nuevo Leon." *Id.* Pygmy-owls are considered non-migratory throughout their range and typically fly from tree to tree instead of on long single flights. Land Options L.L.C., DRAFT BIOLOGICAL ASSESSMENT: ENTRADA DEL ORO 20 (Aug. 9, 2001). They are capable of flying only short distances up to 100 feet or more over undisturbed vegetation. Letter from the U.S. Fish and Wildlife Service to the U.S. Environmental Protection Agency (Oct. 18, 2002).

The Arizona pygmy-owls are a distinctive lot. Unlike the pygmy-owls in Texas and Mexico, they have unique plumage and occupy desertscrub and thornscrub habitats. *Determination of Endangered Status for the Cactus Ferruginous Pygmy-Owl in Arizona*, 62 Fed. Reg. at 10731. They are also subject to unique dangers. "Riverbottom forests and bosques, which supported the greatest abundance of [Arizona] pygmy-owls, have been extensively modified and destroyed by clearing, urbanization, water management, and hydrological changes." *Id.* at 10740. In southern Arizona in particular, the actual loss and fragmentation of riparian habitat and the potential loss of additional habitat and movement corridors have contributed to a significant decline in the total Arizona pygmy-owl population from 36 in 2001 to just 18 in 2002. *Id.* at 10735, 10741; *see also Proposed Designation of Critical Habitat for the Arizona Distinct Population Segment of the Cactus Ferruginous Pygmy-Owl*, 67 Fed. Reg. 71032, 71032 (Nov. 27, 2002).

## II.

The majority contends that we could affirm the judgment in this case based on *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003), where we suggested delisting the Arizona pygmy-owl as a Discrete Population Segment (DPS). Maj. op. at 8109. The majority's position is premature for two reasons. First, we did not vacate the Service's DPS listing of the Arizona pygmy-owl in *Nat'l Ass'n of Home Builders*; instead, we remanded to the district court for further proceedings. Those proceedings are pending, and so the Arizona pygmy-owl has not been delisted as a DPS. Second, and more importantly, we carefully noted in *Nat'l Ass'n of Home Builders* that the "Home Builders do not challenge the [Service's] determination that, once severed from the rest of the western pygmy-owl population, *the Arizona pygmy-owls could be considered endangered*." 340 F.3d at 841 (emphasis added). Our decision in *Nat'l Ass'n of Home Builders,* therefore, has no bearing on the case before us because the Arizona pygmy-owl presently remains protected under the ESA.

### III.

Section 7(a)(2) of the ESA directs all federal agencies, in consultation with the Service, to "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species," 16 U.S.C. § 1536(a)(1), and to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat] of such species." 16 U.S.C. § 1536(a)(2). The ESA's implementing regulations further require a federal agency to complete formal consultation with the Service if the agency determines that any action on its part "may affect" any listed species or critical habitat. The federal agency may complete informal consultation with the Service if the agency determines that any action on its part may affect, but is "not likely to adversely affect," any listed species or critical habitat, and the Director of the Service concurs in writing to the agency's determination. 50 C.F.R. §§ 402.13, 402.14(a).

The majority reads this statutory and administrative scheme as affording federal agencies absolute discretion to determine whether any actions on their part "may affect" any listed species or critical habitat. *See* Maj. op. at 8108 (quoting 51 Fed. Reg. 19926, 19949 (June 3, 1986)) ("[The Service] lacks the authority to require the initiation of consultation."). "Nothing in the regulations," the majority concludes, "mandates the action agency to enter into consultation after it receives such a request." *Id*.

But while an action agency is not required by law to consult the Service, the minimum threshold for an action agency to initiate consultation is low. The "may affect" standard "must be set sufficiently low to allow Federal agencies to satisfy their duty to 'insure' under section 7(a)(2) [that species are not jeopardized]." 51 Fed. Reg. 19926, 19949 (June 3,

1986). A federal agency "must initiate formal consultation if its proposed action 'may affect' listed species or critical habitat. *Any possible effect, whether beneficial, benign, adverse, or of an undetermined character*, triggers the formal consultation requirement . . ." *Id.* at 19949 (emphasis added).

The question, then, is not whether the law mandates the Corps to consult the Service, but whether the Corps arbitrarily and capriciously issued "no effect" determinations in the face of scientific evidence suggesting specific and serious effects of two real estate developments on the Arizona pygmy-owl. Put differently, the question is whether the Corps violated the plain meaning and intent of Section 7(a)(2) of the ESA by foregoing any consultation with the Service.

IV.

Under 5 U.S.C. § 706, we must set aside agency actions that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *United States v. Bean*, 537 U.S. 71, 77 (2002). To determine whether the Corps' "no effect" determinations were "arbitrary and capricious," we must decide whether the Corps "considered the relevant factors and articulated a rational connection between the facts [it] found and the choice [it] made." *Nat'l Ass'n of Home Builders*, 340 F.3d at 841 (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983)). The Corps' decision to forego consultation with the Service "must be reversed [if the Corps] . . . entirely failed to consider an important aspect of the problem." *Id.*

A.

In December 1999, the Corps granted a permit for a 598-acre property in Pima County, (southern) Arizona known as the Continental Reserve project. The development is adjacent to an area then-designated as an Arizona pygmy-owl critical habitat. The Corps determined that the development would

have "no effect" on the Arizona pygmy-owl and issued the permit. The Service objected to the Corps' decision contending specifically that "this particular project area serves as a movement corridor for the [Arizona] pygmy-owl and likely provides nesting, roosting, and foraging habitat." The Corps nonetheless refused to initiate consultation.

Review of the administrative record reveals that the Corps' decision to forego consultation with respect to the Continental Reserve project was both arbitrary and capricious. The Service has persistently objected to the Continental Reserve permit. It has pointed out that the development would (1) result in "the loss and fragmentation of upland and xeroriparian vegetation," (2) lead to loss of "mesquite and palo verde trees and saguaro cacti which are components of [Arizona] pygmy-owl habitat," and (3) "disrupt habitat connectivity . . . hindering the . . . movement corridor for the [Arizona] pygmy-owl." The Service further underscored how the Continental Reserve area contains "those physical and biological features that are essential to the conservation of the species." A "fragmented habitat [would] reduce the probability that local groups of [Arizona] pygmy-owls will recolonize naturally in order to offset population fluctuations and local population losses." *Proposed Designation of Critical Habitat for the Arizona Distinct Population Segment of the Cactus Ferruginous Pygmy-Owl*, 67 Fed. Reg. at 71036.

Both the Biological Evaluation and the Environment Assessment that the Corps relied upon to render its "no effect" determination focused almost entirely on the fact that no Arizona pygmy-owl was physically located in the project area or in the immediate surrounding areas. But the actual physical presence of an Arizona pygmy-owl on or near the development is not the only way to establish a possible effect of the development on the species. The ESA implementing regulations make clear that "any possible effect," even of "an undetermined character," triggers consultation. 51 Fed. Reg. at 19949. The Corps ignored the Service's scientifically com-

pelling evidence demonstrating the effect of the Continental Reserve project on the potential habitat of Arizona pygmy-owls. The Corps had a duty to initiate consultation with the Service about this possible effect.

### B.

In January 2001, the Corps granted a permit for a 404-acre property in Pinal County, (southern) Arizona known as the Entrada del Oro project. The development was located on an area then-designated as an Arizona pygmy-owl critical habitat. The developer itself conceded that the property provided connectivity between the Arizona pygmy-owl breeding habitat along the Salt River and possible Arizona pygmy-owl breeding areas on the Gila river. The Corps thereafter issued a "may affect" determination and initiated informal consultation with the Service. But while the Corps' request for informal consultation was pending, a district court vacated the critical habitat designation in the Entrada del Oro area. The Corps subsequently withdrew its request and issued a "no effect" determination.

Review of the administrative record again reveals that the Corps' decision to change its assessment and forego consultation with respect to the Entrada del Oro project was both arbitrary and capricious. The Service pointed out that "because of the size of the proposed project[,] . . . suitable [Arizona pygmy-owl] habitat present on site and adjacent areas, and the location of the project, [it] [did] not believe adverse effects [were] not likely[,] . . . insignificant[,] or discountable." The developer's own Biological Evaluation further noted that the Entrada del Oro project "does have potential nest cavities in saguaros and a few mesquite and paloverde able to support pygmy-owls" and that "there is suitable habitat within the 440-acre property."

The Corps has not shown why the removal of the critical habitat designation in the Entrada del Oro area rationally

eliminates the previously acknowledged effect of the development on loss of potential habitat for the Arizona pygmy-owl. The ESA implementing regulations make clear that formal consultation is triggered whenever an action "may affect listed species *or* critical habitat." 50 C.F.R. § 402.14(a) (emphasis added). The Corps, and the majority, illogically imply that the presence of a critical habitat is necessary to trigger Section 7 consultation.

V.

At its core, this case is about exercising "institutionalized caution" in safeguarding endangered species. *See Wash. Toxic Coalition v. EPA*, No. 04-35138, slip op. at 7743 (9th Cir. June 29, 2005) ("Placing the burden on the acting agency to prove that the action is non-jeopardizing [of the continued existence of an endangered or threatened species] is consistent with the purpose of the ESA and what we have termed its 'institutionalized caution mandate[ ]'.") (citation omitted); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978) ("Congress has spoken in the plainest of words . . . in favor of affording endangered species the highest of priorities . . . [by] adopting a policy which it described as 'institutionalized caution'."). The Corps ignored the possible effect of two developments on the additional loss and fragmentation of the Arizona pygmy-owl. It arbitrarily and capriciously refused to initiate Section 7 consultation with the Service even though the Service justifiably demanded it. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987) (deferring to the Service as "the agency with the more appropriate expertise"). It may be that further discussion and investigation could vindicate the Corps' present position, but the Corps cannot be permitted to risk endangering the Arizona pygmy-owl by foregoing any consultation with the Service.